DMJ:CNC
F.#2010R01603

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -

DOMINICK CURATOLA,
GERMAN CHAJCHIC and
MICHAEL DECRESENZO,

        Defendants.

- - - - - - - - - - - - - - - - -X

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -

THE PREMISES KNOWN AND DESCRIBED
AS 865 BROADWAY AVENUE, UNIT 107A,
HOLBROOK, NEW YORK

- - - - - - - - - - - - - - - - -X

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -

THE PREMISES KNOWN AND DESCRIBED
AS 865 BROADWAY AVENUE, UNIT 138B,
HOLBROOK, NEW YORK

- - - - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

# M -1C 1340

FILED UNDER SEAL

AFFIDAVIT IN SUPPORT
OF ARREST WARRANTS
AND SEARCH WARRANTS

(T. 21, U.S.C., § 846)

     WILLIAM STEETS being duly sworn, deposes and says that

he is a Special Agent with the Drug Enforcement Administration

("DEA") Task Force, duly appointed according to law and acting as such.

Upon information and belief, in or about and between May 2010 and November 10, 2010, within the Eastern District of New York and elsewhere, the defendants DOMINICK CURATOLA, GERMAN CHAJCHIC and MICHAEL DECRESENZO, together with others, did knowingly and intentionally conspire to distribute and possess with intent to distribute a controlled substance, which offense involved a substance containing marijuana, a Schedule I controlled substance, contrary to 21 U.S.C. § 841(a)(1).

(Title 21, United States Code, Section 846)

Upon information and belief, there is probable cause to believe that there will be located in THE PREMISES KNOWN AND DESCRIBED AS 865 BROADWAY AVENUE, UNIT 107A, HOLBROOK, NEW YORK ("SUBJECT PREMISES ONE"), and THE PREMISES KNOWN AND DESCRIBED AS 865 BROADWAY AVENUE, UNIT 138B, NEW YORK ("SUBJECT PREMISES TWO") within the Eastern District of New York, certain property, namely:

(1) drugs, drug paraphernalia, scales, drug residue, dilutants and materials related to distributing and/or manufacturing drugs;

(2) firearms and ammunition;

(3) books and records, including records stored on electronic media, showing cash transactions, prices and quantities of drugs bought and sold;

(4) books and records, including records stored on electronic media, showing the names, addresses and

telephone numbers of purchasers and suppliers of drugs, as well as the identities of confederates in drug trafficking;

(5) pagers, electronic organizers, cellular telephones, computers, computer storage media, including, but not limited to, compact disks, DVDs, flash drives, thumb drives and external hard drives, and related bills and receipts;

(6) motor vehicle records, telephone bills, property records showing ownership of assets purchased with drug proceeds;

(7) currency used to purchase drugs, or reflecting proceeds of sales of drugs;

(8) banking and financial records, including banking and financial records stored on electronic media, to include wire transfer receipts, bank deposit and withdrawal slips, and any other document evidencing a financial transaction that was conducted with proceeds; and

(9) photographs, photographic negatives (developed and undeveloped), digital camera storage media, including, but not limited to, flash cards and memory sticks, and video tapes or disks, which show the identities of conspirators, contraband and evidence of drug trafficking,

all of which constitute evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846.

The source of your deponent's information and the grounds for his belief are as follows:[1]

---

[1] Because the purpose of this Affidavit is solely to set forth probable cause to arrest and to obtain search warrants, I have not set forth all facts concerning this investigation of which I am aware.

I.  QUALIFICATIONS AND SOURCES

1.  I have been a Special Agent with the Drug Enforcement Administration ("DEA") for approximately ten years. I am currently assigned to a DEA Task Force group in Long Island. During my tenure with the DEA, I have participated in numerous narcotics investigations, during the course of which I have conducted physical and wire surveillance, executed search warrants, and reviewed and analyzed numerous taped conversations and records of drug traffickers. Through my training, education and experience -- which has included debriefing numerous cooperating drug traffickers, conducting numerous searches of locations where drugs and money have been found, and conducting surveillance on numerous occasions of individuals engaged in drug trafficking -- I have become familiar with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs, and the efforts of persons involved in such activity to avoid detection by law enforcement.

2.  The facts set forth in this affidavit are based on my personal knowledge and observations; my discussions with members of the Task Force and other law enforcement officers, including members of the Nassau County Police Department ("NCPD"); my review of reports written by other law enforcement officers; my review of telephone communications that were intercepted in connection with this investigation; my review of

line sheets of telephone communications that were intercepted in connection with this investigation;[2] my review of affidavits submitted to the court by other law enforcement officers during this investigation; my discussions with other individuals; my review of documents related to this investigation, including telephone records and criminal history records, and my training and experience.

II.  DESCRIPTIONS OF THE SUBJECT PREMISES

3.  SUBJECT PREMISES ONE is part of the Hillcrest residential complex, a guarded, multi-unit residential community which is located on the east side of Broadway Avenue in Holbrook, in Suffolk County, New York.  There are several residential buildings that are part of this complex.  Unit 107A is part of building number 10, which is located in the south east section of the complex.  Building number ten is a two-story premises.  As one views Unit 107A from the front of the premises, the front door is white, with the designation "107A" printed in black letters.  There is a mail slot and door knocker on the front door, which is on the ground level.  As one views this unit from the front, there is a window to the right of the front door.

---

[2] Unless otherwise stated, the conversations set forth in the affidavit are in substance and in part.  To the extent that quotations are used in the descriptions of intercepted calls below, the quoted segments are based on synopses and reviews of recordings and not final transcripts.

4. SUBJECT PREMISES TWO is also part of the Hillcrest residential complex. Unit 138B is part of building number 13, which is located in the north west section of the complex. Building number 13 is a two-story premises. As one views Unit 138B from the front of the premises, the front door is white, with the designation "138B" printed in black letters. There is a mail slot and door knocker on the front door, which is on the ground level.

III. PROBABLE CAUSE FOR ARREST WARRANTS AND SEARCH WARRANTS

A. **Background**

5. This investigation is a joint investigation of the NCPD, DEA Task Force, Nassau County District Attorney's Office ("NCDAO") and the United States Attorney's Office for the Eastern District of New York. During the course of this investigation, the NCPD received authorization from Associate Justices of the Appellate Division, Supreme Court of the State of New York, Second Judicial District, to intercept communications occurring over mobile telephone numbers used by the defendants DOMINICK CURATOLA, GERMAN CHAJCHIC and MICHAEL DECRESENZO. Some of the intercepted calls and text messages are discussed below.

6. Interception, along with other investigative measures, have revealed, among other things, that the defendant DOMINICK CURATOLA, who resides in Holbrook, New York and is currently on federal supervised release in the Eastern District

of New York ("EDNY"), conspired with defendants GERMAN CHAJCHIC, MICHAEL DECRESENZO and others, to import and distribute multi-kilogram quantities of marijuana. CURATOLA was convicted in June 2008 in the EDNY for, among other offenses, conspiracy to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846. MICHAEL DECRESENZO was convicted, in a case related to CURATOLA's case, in the EDNY in May 2005 of conspiracy to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846, and arson, in violation of 18 U.S.C. § 844(i). DECRESENZO is also currently on federal supervised release in the EDNY.

7.     CHAJCHIC is currently pending sentencing in the EDNY for his participation in a gang-related assault with a firearm and is under the supervision of the Pretrial Services Agency. CURATOLA and CHAJCHIC were both incarcerated at the Queens Private Correction Facility ("QPCF"); they overlapped at the QPCF from in or about and between September 2005 and February 2007, and again from in or about and between February 2008 and July 2008.

8.     The investigation has further revealed that CURATOLA has a source of supply, nicknamed "Dave," in Canada for the marijuana. During the course of this investigation, law enforcement officers have seized marijuana based on, among other things, intercepted telephone calls and text messages, and

surveillance of CURATOLA and his associates.

9. The United States Probation Department for the EDNY has advised, in sum and substance, that DOMINICK CURATOLA resided at SUBJECT PREMISES TWO (Unit 138B) with his mother until approximately February 2010, when he moved into SUBJECT PREMISES ONE (Unit 107A). CURATOLA's probation officer advised, in sum and substance, that during a home visit of SUBJECT PREMISES ONE in or about early September 2010, the probation officer observed a large quantity of cash on a table, which CURATOLA claimed he earned from his painting business. The Probation Department also advised that CURATOLA has an electronic mail (e-mail) account. Based on my knowledge of this investigation, I am aware that CURATOLA has a Facebook (a social networking website) account, as well as an E*trade account. Therefore, there is probable cause to believe that CURATOLA has access to a computer at one of the SUBJECT PREMISES.

10. During this investigation, law enforcement officers intercepted hundreds of communications between defendants DOMINICK CURATOLA and MICHAEL DECRESENZO, which indicated that CURATOLA and DECRESENZO worked closely to sell marijuana and other controlled substances. For instance, on or about the night of May 15, 2010, Detectives of the NCPD conducted surveillance in the vicinity of the Hillcrest complex, where CURATOLA resides. The Detectives observed CURATOLA, DECRESENZO

and another male individual ("MI-1") drive to a dead-end within CURATOLA's complex in two cars. During this investigation, MI-1 has delivered marijuana to and picked up marijuana from CURATOLA. Detectives further observed CURATOLA and DECRESENZO remove a cardboard bag and garbage bag from MI-1's car and re-enter CURATOLA's white Lexus vehicle. Minutes later, CURATOLA and DECRESENZO were observed carrying the cardboard box and garbage bag toward SUBJECT PREMISES TWO. Based on calls intercepted earlier that day, I believe that MI-1 delivered marijuana to CURATOLA. For instance, in one of those calls, CURATOLA stated: "I can take all three but can only give u cod for 1 for now makin another move tonight with my reg guy." By "making another move with my reg guy," I believe that CURATOLA was saying that he would be receiving more marijuana that night from his regular supplier.

      11. On July 8, 2010 at approximately 9:54 p.m., a text message was intercepted from a mobile telephone used by CURATOLA, which read "Can get u ak47 tomo but its 46 can have mikey handle maybe widow he know widow guy." The user of the other mobile telephone replied, "Ok cause the ak47 is to high." Based on my training and experience and knowledge of this investigation, I believe that "ak47" was a reference to a type of high grade marijuana, that "46" referred to $4600 per pound, and that "mikey" was a reference to defendant MICHAEL DECRESENZO.

12. On July 11, 2010, law enforcement officers intercepted a series of conversations and communications which illustrated how defendant MICHAEL DECRESENZO worked closely with CURATOLA to supply marijuana and other controlled substances. For instance, that evening, a mobile telephone used by CURATOLA sent a text message to a mobile telephone used by a marijuana customer of CURATOLA, which stated, "8:00 be by my place." CURATOLA's mobile telephone received the following response: ."Can I possibly get the rest of superman. And ill be there at 8." Based on my training and experience, I believe that "superman" is a slang expression for ecstasy.

13. At approximately 7:09 p.m., a mobile telephone used by CURATOLA sent a text message, which read "8:15 hell be at my complex that good for u", to a mobile telephone used by DECRESENZO. Based on my training and experience and my knowledge of this investigation, I believe that by "my complex" CURATOLA was referring to the Hillcrest complex in Holbrook, where CURATOLA lives. At approximately 7:18 p.m., we intercepted a conversation between CURATOLA and DECRESENZO. During this conversation, DECRESENZO agreed, in sum and substance, to meet CURATOLA's friend the "school boy" at 8:15 p.m. at CURATOLA's condominium complex. At approximately 7:48 p.m., a text message was sent from a mobile telephone used by CURATOLA to the customer discussed above in paragraph 12, which read "Tell him (meaning, I

believe, DECRESENZO) about superman when u see him but I think ur
gonna have to wait till tomo for superman cant get in touch with
my brother and he has keys to my." At approximately 8:02 p.m., a
mobile telephone used by DECRESENZO sent CURATOLA a text message
which read "Here." At approximately 8:24 p.m., we intercepted a
call between CURATOLA and his customer. The customer told
CURATOLA, in sum and substance, that he was running late because
he got pulled over by a Sheriff and was scared because he had the
"low low" in his car. CURATOLA told his customer, in sum and
substance, to meet DECRESENZO in the back lot by his (CURATOLA's)
house. Based on my training and experience, I believe that by
"low low" the customer was referring to a low grade quality of
marijuana.

14. At approximately 8:51 p.m. on July 11, 2010, a
text message was sent from a mobile telephone used by CURATOLA to
a mobile telephone used by DECRESENZO, which read "He's there in
a black jeep." Based on my knowledge of this investigation, I
believe CURATOLA was describing the car driven by his customer,
who was going to meet DECRESENZO at CURATOLA's condominium
complex. Later that night, there was a series of text messages
between CURATOLA and his customer. During these messages,
CURATOLA told his customer, in sum and substance, that he would
have "Superman" available for him on Tuesday (July 13, 2010).
The customer replied that he would definitely need more on

Tuesday and thanked CURATOLA.

**B.  The August 10, 2010 Marijuana Shipment**

15.  In a telephone conversation intercepted on or about August 7, 2010, "Dave" told defendant DOMINICK CURATOLA that he had "good news," that "Monday or Tuesday it's gonna be in your hands." "Dave" further told CURATOLA, in sum and substance, that the shipment would be split between "you and the other guy, fifty to you, and fifty to the other guy." "Dave" added that he would be able to make another 100 pound shipment if CURATOLA wanted within "two or three days," of the delivery of the first fifty pounds.

16.  Based on my training and experience and my knowledge of this investigation, including hundreds of intercepted calls and text messages and my discussions with Detectives of the NCPD, I believe that when "Dave" stated "fifty to you," he was referring to fifty pounds of marijuana. I further believe that by "fifty to the other guy," "Dave" was referring to another fifty pounds of marijuana going to another customer of "Dave" in the New York City/Long Island area.

17.  Later in the afternoon on August 7, 2010, we intercepted an outgoing call from the defendant DOMINICK CURATOLA to "Dave." In this conversation, CURATOLA asked "Dave," in sum and substance, to further describe the type of product CURATOLA would be receiving, and "Dave" responded that he was sending

"fifty straight Jacks." "Dave" further stated, in sum and substance, that if CURATOLA was able to sell those that quickly, he would then be able to quickly deliver to CURATOLA another "one hundred." CURATOLA asked, in sum and substance, that "Dave" begin preparing more to be shipped to him "right away."

18. Based on my training and experience and my knowledge of this investigation, I believe that "Jacks" was a reference to a particular grade of marijuana and that by another "one hundred," "Dave" meant another one hundred pounds of marijuana. Furthermore, I believe that when CURATOLA asked "Dave" to ship him more "right away," he was requesting more marijuana.

19. At the end of day on August 7, 2010, at approximately 7:38 p.m., CURATOLA called "Dave" and asked whether "Dave" "gave them (presumably a narcotics courier) the number already?" meaning, the telephone number that "Dave's" courier was going to use to contact CURATOLA. "Dave" stated, in sum and substance, that he had already given the courier that telephone number. CURATOLA advised "Dave" that he could not locate that telephone, and "Dave" said that CURATOLA should send him "another number." CURATOLA agreed to do that, and said that he would "call him now." "Dave" directed CURATOLA to send him the new telephone number "through the other guy." CURATOLA a agreed that he would do that.

20. One minute later, at approximately 7:39 p.m., we intercepted an outgoing call from CURATOLA to the defendant GERMAN CHAJCHIC. Based on my knowledge of this investigation, I believe CHAJCHIC brokered the marijuana business relationship between CURATOLA and "Dave" and acts as an intermediary between CURATOLA and "Dave," passing information, including telephone numbers.[3] In their conversation, CURATOLA told CHAJCHIC said that he had spoken to "our friend today," likely a reference to "Dave." CURATOLA asked that CHAJCHIC "call him" (presumably "Dave,"), "and give him this number." CHAJCHIC asked CURATOLA to "hold on," since he was driving, but had a "pen in his car." Before Curatola could give him the telephone number, the call was cut off.

21. In a subsequent conversation just moments later, CURATOLA gave CHAJCHIC the telephone number CURATOLA wanted CHAJCHIC to forward to "Dave." CHAJCHIC stated that he would "call him," meaning, I believe, "Dave". At approximately 7:57 p.m. on August 7, 2010, CURATOLA's mobile telephone received a

---

[3] In an earlier conversation between CURATOLA and "Dave," "Dave" asked when CURATOLA could meet with "Dave" in Canada. CURATOLA expressed some concerns about crossing the border given his status on probation, but said that "me and Germ" are trying to put something together." CURATOLA added that both he and "Germ" wanted to discuss this business proposition with "Dave". Based on my training and experience and my knowledge of this investigation, I believe that in this conversation, CURATOLA expressed to "Dave" that he (CURATOLA) and "Germ" (GERMAN CHAJCHIC) were interested in receiving shipments of marijuana from "Dave."

text stating "Done" from the mobile telephone used by CHAJCHIC.

22. On or about Monday, August 9, 2010, at 7:35 a.m.,
"Dave" called the defendant DOMINICK CURATOLA. In this
conversation, "Dave" told CURATOLA that "everything is out of my
hands, everything took off." "Dave" went on to say, "expect a
phone call on the number you gave me." Based on my training and
experience and my knowledge of this investigation, I believe that
in this call, "Dave" told CURATOLA that the courier left with the
marijuana, was headed to CURATOLA and that the courier would call
CURATOLA on another telephone "Dave" and CURATOLA decided to use
for the marijuana delivery. "Dave" further told CURATOLA, in sum
and substance, that the courier would "call you when he's close."

23. Anticipating the delivery of the one hundred
pounds of marijuana from the courier of "Dave," law enforcement
officers attempted to follow the defendant DOMINICK CURATOLA as
closely as possible during August 9, 2010. However, during an
intercepted call, on August 9, 2010, at approximately 4:25 p.m.,
CURATOLA told "Dave" that he intended to "drop this one,"
(meaning, I believe, the telephone he was then speaking on to
"Dave"), because he (CURATOLA), was "paranoid." Surveillance of
CURATOLA on August 9, 2010 revealed that he was looking around
his area constantly, and that he appeared to be more nervous than
usual. Law enforcement officers decided to discontinue
surveillance of CURATOLA on August 9, 2010 for fear that it would

jeopardize the investigation.

24.  However, the conversations intercepted on August
10, 2010, confirmed that the defendant DOMINICK CURATOLA received
a delivery of fifty pounds of marijuana from "Dave."  On August
10, 2010 at approximately 2:41 p.m., "Dave" called CURATOLA.
CURATOLA told "Dave" that "they said they're gonna be there soon,
probably any minute," a likely reference, I believe, to the
arrival of "Dave's" narcotics courier (courier #1), who would be
delivering fifty pounds of marijuana to CURATOLA.

25.  During a telephone conversation at approximately
3:19 p.m. on August 10, 2010, CURATOLA asked "Dave" in sum and
substance, if he wanted CURATOLA to give "this guy paper."  Based
on my training and experience and my knowledge of this
investigation, I believe that by "paper," CURATOLA meant cash for
the marijuana he had received.  "Dave" responded that "another
guy" would meet CURATOLA for that.  CURATOLA said that he would
have "a hundred and change tonight and the rest tomorrow night."
I believe that, in this conversation, "Dave" explained to
CURATOLA that another associate of "Dave" would meet with
CURATOLA to receive payment for the marijuana and that CURATOLA
told "Dave" that he would have more than $100,000 ready on the
night of August 10 to pay "Dave" and more money ready the
following night.  "Dave" then asked if CURATOLA "wanted more,"
and CURATOLA stated, in sum and substance, to give him "three or

four days" to sell the product he received.

26.  At approximately 3:51 p.m. on August 10, 2010, CURATOLA told "Dave" that he received "three bags." CURATOLA said that there was "glue" on all three bags, and that they were "sealed." Based on my training and experience, I know that drug traffickers often put glue on the zipper of bags containing narcotics to ensure that the courier does not steal narcotics from the bags.

27.  Later on August 10, 2010, conversations between the defendant DOMINICK CURATOLA and "Dave" revealed that CURATOLA was dissatisfied with the quality of the marijuana he received from "Dave." For example, at approximately 6:55 p.m. CURATOLA told "Dave" that he was looking through "them" and "counted them all" and said that "everything was there," meaning, that CURATOLA had weighed the product, and had in fact received fifty pounds of marijuana as promised. But, CURATOLA claimed that "a lot of them look like M-39." Based on my training and experience and my knowledge of this investigation, I believe that M-39 was a reference to a lower quality of marijuana than the "Jacks."

28.  "Dave" defended the quality of the product, and stated that "the ones that look smaller, they're even nicer than the bigger ones." CURATOLA said that he tried to "bring twenty (20 pounds) to someone and he didn't want them . . . just not up to the standard that people are doing over here . . . I'm gonna

get a lot of complaints basically." "Dave" asked "how many are like that?" and CURATOLA responded "a big percentage." "Dave" asked "what's wrong with them?" and CURATOLA responded "the color, the crystal count, the smell is not so spectacular."

29. As a result of CURATOLA's complaints, in conversations intercepted later that day, "Dave" agreed, in sum and substance, to drop the price of the fifty pounds of marijuana he had delivered to CURATOLA down to $2,600 per pound, and spoke to CURATOLA about arranging to deliver to him a shipment of one hundred pounds of higher quality marijuana on "Monday," (August 16, 2010).

30. Moreover, conversations intercepted during the evening of August 10, 2010, revealed that CURATOLA ended up receiving an additional fifty pounds of marijuana from "Dave" that night because "Dave's" other customer became nervous during the transaction and left without taking his fifty-pound shipment of marijuana.

31. At approximately 7:10 p.m., "Dave" instructed his associate to "go back to my friend's house," meaning, I believe, CURATOLA's residence. At approximately 8:06 p.m., CURATOLA gave "Dave's" associate directions to his condominium complex, located in Holbrook. CURATOLA said he would meet "Dave's" associate at the complex in "twenty minutes." Based on my knowledge of this investigation, I believe that CURATOLA received a total of 100

pounds of marijuana from "Dave" on August 10, 2010.

32. A couple of days later, intercepted calls between CURATOLA and "Dave" revealed that the two men made arrangements for CURATOLA to pay "Dave" for the marijuana. On August 12, 2010 at approximately 8:59 a.m., CURATOLA told "Dave" that he would meet the person who would collect the "paper," meaning, the cash. CURATOLA stated, in sum and substance, that he would give "him" "one thirty" (meaning, I believe, $130,000). "Dave" told CURATOLA, in sum and substance, that he was working on getting the "D's," (which I believe, based on my training and experience, to be Diesel brand marijuana, which is a high grade of marijuana) for the next planned shipment to CURATOLA. CURATOLA said that he would call "Dave" after he had seen the "paper guy," referring, I believe, to the person "Dave's" organization was sending to collect the money. "Dave" instructed CURATOLA to "seal" the bag with the money. CURATOLA said, in sum and substance, that he would deliver the money in a duffle bag or backpack.

33. On August 12, 2010 at approximately 12:09 p.m., an unidentified male ("UM-1") asked CURATOLA, in sum and substance, to text message to UM-1 CURATOLA's location so that UM-1 could send someone to meet CURATOLA. It is reasonable to conclude that this was for the location where the money pick-up was due to occur. Later that day, at approximately 4:00 p.m., CURATOLA directed another unidentified male ("UM-2") to meet him at a gas

station near "exit 48." In a call intercepted at approximately 4:17 p.m., CURATOLA directed UM-2 to a location on Westwood Drive, off of Round Swamp Road, located in Old Bethpage, Nassau County, New York, which is the road on Exit 48 of the Long Island Expressway, Nassau County, New York.

34. On August 20, 2010, law enforcement officers intercepted communications pertaining to the second payment that was to be made for the additional fifty pounds of marijuana CURATOLA received on August 10, 2010. On August 20, 2010 at approximately 5:39 p.m., CURATOLA told "Dave" that he would be ready with the "files" on "Sunday" (August 22, 2010). Based on my training and experience and knowledge of this investigation, I believe that by "files," CURATOLA was referring to the money he owed "Dave" for the fifty pounds of marijuana that was originally intended for "Dave's" other customer, but which CURATOLA received. "Dave" then told CURATOLA, in sum and substance, that he would "set everything up for Sunday or Monday" (August 22 or 23) for the balance of money to be picked up from CURATOLA.

35. On August 22, 2010 at approximately 12:44 p.m., CURATOLA told "Dave" that "tomorrow would be better for me," presumably for CURATOLA to pay the balance of the August 10, 2010 shipment. In a series of communications intercepted that day, CURATOLA made arrangements to deliver the balance of the money owed to "Dave" to an unidentified person on August 23, 2010 in

the "West Village" in Manhattan.

36. On August 23, 2010 at approximately 8:50 a.m., law enforcement officers intercepted an outgoing text message from CURATOLA's mobile telephone to the mobile telephone used by an unidentified male ("UM-3")," which stated, "Hey ill be in by 2 so I don't hit traffic on the way back that cool ?" to which the individuals responded "Yes." At approximately 11:51 a.m., CURATOLA's mobile telephone received the following text message from the telephone used UM-3: "Call me when ur on foot at 7th and barrow." At 2:09 p.m., there was a text message from CURATOLA's telephone to the telephone used by UM-3, which stated: "34th and park ave." CURATOLA's mobile telephone received the following text message in response: "No problem no hurry! Watch ur background."

37. At approximately 2:15 p.m., CURATOLA received a call from UM-3. Courier #2 gave CURATOLA directions to "Barrow," from CURATOLA's location. Around the time of that conversation, the mobile telephone being used by CURATOLA sent an outgoing text message to the telephone being used by UM-3, in which he stated that he was in "5 guys burger."

38. Based upon these conversations, members of law enforcement, who were conducting surveillance of CURATOLA, went to the area of Five Guys Burger, located at the intersection of 7th Avenue and Bleeker Street in Manhattan. At that time, law

enforcement officers saw CURATOLA get out of his white Lexus and go into that restaurant carrying a knapsack. While at that location, members of the surveillance team saw that CURATOLA's white Lexus was being driven by defendant MICHAEL DECRESENZO. At about 2:30 p.m., we saw CURATOLA meeting in the area of Morton Street with an unidentified male. When members of the surveillance team initially saw CURATOLA meeting with this unidentified male, CURATOLA was carrying the knapsack. Members of the surveillance team lost sight of both CURATOLA and the unidentified male as they walked away from that location. When members of the surveillance team next saw CURATOLA, he was walking on Morton Street near the intersection of Bedford Avenue and 7th Avenue without the knapsack.

39. At approximately 2:50 p.m. on August 23, 2010, CURATOLA told "Dave" that he saw the "paper guy." CURATOLA explained that he came to the "city to see him."

C. **The November 4, 2010 Marijuana Shipment**

40. On November 2, 2010 at approximately 12:34 p.m., law enforcement officers intercepted a conversation over a mobile telephone used by the defendant DOMINICK CURATOLA and an unidentified male ("UM-4"). UM-4 asked CURATOLA if there was "anything going on?" CURATOLA responded that he was "waiting." Later on November 2, 2010, at approximately 4:59 p.m., law enforcement officers intercepted an outgoing text message from

CURATOLA's mobile telephone, which stated, "Hey brother not going to be till tomo." Also on November 2, 2010 at approximately 7:05 p.m., CURATOLA spoke to a male individual ("MI-2"), whose identity is known to law enforcement officers. MI-2 told CURATOLA that "one of [his] boys" was interested in receiving "three" of the "M-39s." CURATOLA a said that he "had them." CURATOLA also said in this conversation that he was "waiting on the nicer ones." Based on my training and experience and my knowledge of this investigation, I believe that "M-39" is a slang expression for a low grade quality of marijuana and that, in this conversation, MI-2 advised CURATOLA that one of his customers wanted three pounds. I further believe that CURATOLA told MI-2 that he was expecting to receive a higher quality grade of marijuana ("the nicer ones").

41. On November 3, 2010 at approximately 12:04 p.m., CURATOLA received an incoming call from the defendant GERMAN CHAJCHIC. In the conversation, CHAJCHIC asked "today or tomorrow, do you know?" CURATOLA responded, in sum and substance, that he was still "waiting." CURATOLA said that he would "text you on this," (referring, I believe, to the telephone being used by CHAJCHIC during their conversation) when he knew.

42. Later that day, at approximately 5:40 p.m., we intercepted an incoming call from "Dave" to CHAJCHIC. In the conversation, CHAJCHIC asked if "Dave" needed to speak to "Dom."

Based on my knowledge of this investigation, I believe that "Dom" was a reference to DOMINICK CURATOLA. "Dave" responded, in sum and substance, that he did, because he had "a couple of friends of mine that are trying to reach him." This was the same system "Dave" used to contact CURATOLA in the August 10, 2010 marijuana transaction. "Dave" said that he would call CURATOLA "right away."

43. At approximately 5:56 p.m. on November 3, 2010, we intercepted a text message that was sent from a mobile telephone used by CHAJCHIC to a mobile telephone used by CURATOLA, which stated, "My friend called to speak to u give him a call when u can." The CURATOLA mobile telephone responded: "Eatin with my girl call u soon tell him call @ 715 . . . What he say." The CHAJCHIC phone replied: "He said call him asap." At approximately 7:16 p.m., the CHAJCHIC telephone the following text message to the CURATOLA phone: "He said call him asap." Based on my training and experience, and my knowledge of this investigation, I believe that the "friend" referred to in the above-described text messages is "Dave," a source of supply ("SOS") of the marijuana in Canada, and that, at times, CHAJCHIC communicates with "Dave" in Canada for CURATOLA.

44. After this, on November 3, 2010 at approximately 7:58 p.m., law enforcement officers intercepted an incoming call to CURATOLA from a male individual ("MI-3") who asked Curatola if

it was "cool if I see you in the morning." MI-3 and CURATOLA
agreed that they would meet at around "tenish." MI-3 further
stated, in sum and substance, that he would call CURATOLA "when
he was in the area." CURATOLA said that he would "be here."
MI-3 further stated "everything's cool on my end," which I
believe, based on my knowledge of this investigation, means that
he had the marijuana ready to deliver to CURATOLA.

45. A few minutes later, we intercepted a conversation
between CHAJCHIC and CURATOLA in which CURATOLA stated, in sum
and substance, that the event which they were waiting for would
happen "tomorrow." CURATOLA complained to CHAJCHIC that he had
been "waiting for three days." During their conversation,
CURATOLA explained, in sum and substance, that he was confident
that he would receive the item they were waiting for because
"he's reliable the guy, I know who he sends." CURATOLA further
stated that, after he met this person, "I'll stop and see you,"
which I interpret to mean that CURATOLA would then go to see
CHAJCHIC once CURATOLA had obtained the marijuana from MI-3.
CURATOLA and CHAJCHIC agreed to speak tomorrow (November 4,
2010).

46. At approximately 9:25 a.m. on November 4, 2010,
members of the DEA Task Force who were conducting surveillance in
the vicinity of CURATOLA's residence in the Hillcrest complex,
observed CURATOLA leave SUBJECT PREMISES ONE carrying a plastic

shopping bag. CURATOLA entered his white Lexus vehicle and left the Hillcrest complex. Approximately 25 minutes later, CURATOLA returned to the complex and parked near SUBJECT PREMISES TWO. CURATOLA then walked toward SUBJECT PREMISES TWO.

47. On November 4, 2010 at approximately 10:16 a.m., we intercepted an outgoing text message from one of the mobile telephones used by CURATOLA, which stated, "U wanna hang with jack today let me kno." As discussed earlier, based on my training and experience and knowledge of this investigation, I believe "jack" is a reference to a high grade marijuana.

48. A few minutes later, at approximately 10:19 a.m., we intercepted an incoming call from MI-3 to the defendant DOMINICK CURATOLA. MI-3 told CURATOLA that he was "at that place you told me to go down at the end." CURATOLA responded that he would be "out in two seconds." A member of the DEA Task Force observed CURATOLA enter his white Lexus vehicle and drive toward the end of a dead-end street within the Hillcrest complex, where CURATOLA met with a white male individual for less than one minute. Based on my knowledge of this investigation, I believe the white male was MI-3. Based on the way the surveillance vehicle was positioned, the Task Force Officer could not see CURATOLA and MI-3 while they were together, but the Task Force Officer did hear car doors opening and closing.

49.  At approximately 10:46 a.m., a mobile telephone used by CURATOLA sent a text message to the a mobile telephone used by CHAJCHIC.  The text message stated: "All good call me when u get off."  At approximately 12:31 p.m., CURATOLA and CHAJCHIC spoke.  CHAJCHIC initially asked CURATOLA to "text me some names and numbers."  Based on my training and experience and my knowledge of this investigation, I believe this was a coded request for prices and grades of marijuana that CURATOLA had received from MI-3.  CURATOLA responded that he had the "just one thing . . . Jack."  CHAJCHIC responded, "oh, it's not what we had said."  CURATOLA responded, "no, he didn't send those."  CHAJCHIC then asked about the "numbers," that is, the price per pound for what CURATOLA had received.  CURATOLA responded that  "same numbers, Jack, same thing."   CHAJCHIC responded, "Ok cool." CHAJCHIC said that he would "call you when I get off."

50.  At 12:40 p.m. on November 4, 2010, CHAJCHIC called CURATOLA.  CHAJCHIC asked if he could send his "little brother over there," presumably, I believe, to pick up the marijuana. CURATOLA stated, in sum and substance and in coded language, that he was not ready to see his brother yet, that he would not be ready to meet CHAJCHIC or his brother until "later tonight anyway,"  because "I can't get to it right now anyway."  CHAJCHIC said that "my boy just called, is it happening today?"  CURATOLA answered that "it happened today . . . when it gets dark."  Based

on my training and experience and my knowledge of this
investigation, I believe that CURATOLA informed CHAJCHIC that
CURATOLA will make the delivery of marijuana once it is dark
outside. CHAJCHIC asked CURATOLA to "call me when you are
ready," and CURATOLA said "Ok."

51. Later that afternoon, at approximately 4:46 p.m.,
a mobile telephone used by CHAJCHIC sent the following text
message to a mobile telephone used by CURATOLA: "Bro I might
have to send my bro tomorrow forgot I had dinner im going to need
2 tickets let me know how much for me." At approximately 5:05
p.m., we intercepted an outgoing text message from CURATOLA to
CHAJCHIC, which read: "Sendur bro out her now 3800 each sell em
for 42." At approximately 5:13 p.m., we intercepted this
response from a mobile telephone used by CHAJCHIC: "Is going to b
tomorrow my bro goes there is that cool." CURATOLA responded
"Ok." Based on my training and experience and my knowledge of
this investigation, I believe that CURATOLA and CHAJCHIC were
arranging for CHAJCHIC or an associate of CHAJCHIC to pick up
marijuana from CURATOLA and that CURATOLA advised he would sell
each pound to CHAJCHIC for $3800, which CHAJCHIC could then re-
sell for $4200 per pound.

52. At 12:35 p.m. on November 4, 2010, an unidentified
male ("UM-5") called CURATOLA and asked if "Jack is here?"
CURATOLA responded, "yeah, Jack's around." CURATOLA then

repeated, "Jack's back around." CURATOLA asked, in sum and substance, what UM-5 wanted to do. UM-5 responded, "eight right now," meaning, I believe, that UM-5 wanted to purchase eight pounds of marijuana. UM-5 said that he needed to leave in an hour and a half to go to "probation." CURATOLA said that he "won't be that long, he's at an (inaudible location)."

53. At approximately 3:19 p.m. on November 4, 2010, we intercepted an incoming call to CURATOLA from MI-2, who was discussed above at paragraph 40. Based on my training and experience and my knowledge of this investigation, I believe in this conversation, CURATOLA and MI-2 discussed a potential customer, who wanted to get involved in the marijuana business with MI-2. CURATOLA stated, in sum and substance, that if the buyer took "fifteen, twenty," they'll sell to him for "thirty-nine." By this, I believe CURATOLA meant that if the buyer purchased more than 15 pounds of marijuana, CURATOLA and MI-2 would charge $3900 per pound. CURATOLA then corrected himself and stated, in sum and substance, that he would charge "thirty-nine," if the buyer took "over ten," but if he "takes under ten, it is four." CURATOLA further stated that the type of product they would be selling to MI-2's buyer would be "Jack."

54. Based on my training and experience and my knowledge of this investigation, I believe that CURATOLA explained to MI-2 that if the buyer purchased more than 10 pounds

of marijuana, the price per pound would be $3900; whereas, if the buyer purchased less than 10 pounds, the price per pound would be $4000. As discussed earlier, "Jack" refers to a high grade of marijuana. CURATOLA advised MI-2, in sum and substance, that it was always better to use a middle man if possible to "insulate yourself" from a problem.

55. MI-2 also stated, in sum and substance, that he knew two other friends from Hofstra who would be interested in moving marijuana. According to MI-2, one guy from Hofstra will move "twenty, thirty a week," which I interpret to mean 20-30 pounds of marijuana per week. MI-2 advised that he offered to bring them "sample products" and that one of the individuals told MI-2 that they were getting "California stuff." CURATOLA stated, in sum and substance, that if these persons were getting their marijuana directly from "Cali," they would get it for "thirty-two, thirty-three" (meaning, I believe, $3200 or $3000 per pound).

56. At approximately 4:33 p.m. on November 4, 2010, we intercepted an incoming call to CURATOLA from an unidentified male ("UM-6"), who said that he would be able to "get rid of them all," but went on to say that "five of them are the bad shit we had, the other one (inaudible) jack." CURATOLA responded that he was unable to "open them and check every single one." CURATOLA asked, in sum and substance, if UM-6 could "see what you can do"

in terms of the re-sale, and UM-6 responded that they "all would go." CURATOLA asked if the product had "less red hairs or more." UM-6 responded, in sum and substance, that the better portions of the product that he received "looks better, smells ten times better, and had a better texture, it is not crunchy." CURATOLA responded, in sum and substance, that the only way he would be able to evaluate the product would be to check each one individually, which would be a "pain in the balls."

57. Based on my training and experience and my knowledge of this investigation, I believe that in this conversation, UM-6 advised CURATOLA that five pounds of the marijuana that UM-6 received from CURATOLA was of poor quality ("the bad shit"), but that UM-6 believed he could sell all the marijuana regardless ("all would go"). I further believe that CURATOLA explained to UM-6 that he (CURATOLA) could not inspect every single pound of marijuana he received, presumably because he received a large shipment of marijuana and it would take too long to inspect each pound.

58. On November 6, 2010 at approximately 11:51 a.m., CHAJCHIC called CURATOLA and stated, in sum and substance, that he wanted to come see CURATOLA later that day. At approximately 12:32 p.m., CHAJCHIC again called CURATOLA and asked if CURATOLA was "at your house," and when CURATOLA responded "yeah," CHAJCHIC

said that he was 'going inside (meaning, I believe, the Hillcrest complex), now."

59. On November 6, 2010 at approximately 12:10 p.m., a mobile telephone used by CURATOLA sent a text message to an area code (516) number, which stated "Tell ur boy only 8 left." Based on my training and experience and my knowledge of this investigation, I believe that by "only 8 left" CURATOLA was referring to eight pounds of marijuana from the shipment he received on November 4, 2010.

60. On November 6, 2010 at approximately 12:26 p.m., a mobile telephone used by CURATOLA sent a text message to an individual we have identified as a customer of CURATOLA and distributor of marijuana, which stated, "Find out how many he wants asap limited supply." At approximately 1:32 p.m., defendant MICHAEL DECRESENZO called CURATOLA and told CURATOLA that he would stop by to see him. CURATOLA said that he was "by my house," and told Decresenzo to "go to Mom's." Based on my knowledge of this investigation, I believe that by "Mom's" CURATOLA was referring to SUBJECT PREMISES TWO.

D. **Evidence Commonly Found At Locations Where Narcotics are Stored, Manufactured and Distributed**

61. Based on my training, experience, participation in organized crime, drug and gang investigations, execution of search warrants, debriefing of confidential informants and extensive discussions with other experienced law enforcement

officers, I am familiar with the typical distribution and trafficking methods used by drug dealers and traffickers.

62. In a substantial number of searches executed at locations where narcotics are stored, manufactured and/or distributed out of, such as SUBJECT PREMISES ONE and SUBJECT PREMISES TWO, the following kinds of drug-related evidence have typically been recovered:

(a) drugs, drug paraphernalia, scales, drug residue, dilutants and materials related to distributing and/or manufacturing drugs;

(b) firearms and ammunition;

(c) books and records, including records stored on electronic media, showing cash transactions, prices and quantities of drugs bought and sold;

(d) books and records, including records stored on electronic media, showing the names, addresses and telephone numbers of purchasers and suppliers of drugs, as well as the identities of confederates in drug trafficking;

(e) pagers, electronic organizers, cellular telephones, computers, computer storage media, including, but not limited to, compact disks, DVDs, flash drives, thumb drives and external hard drives, and related bills and receipts;

(f) motor vehicle records, telephone bills, property records showing ownership of assets purchased with drug proceeds;

(g) currency used to purchase drugs, or reflecting proceeds of sales of drugs;

(h) banking and financial records, including banking and financial records stored on electronic media, to include wire transfer receipts, bank deposit and withdrawal slips, and any other document

evidencing a financial transaction that was
conducted with proceeds; and

(i) photographs, photographic negatives (developed and
undeveloped), digital camera storage media,
including, but not limited to, flash cards and
memory sticks, and video tapes or disks, which
show the identities of conspirators, contraband
and evidence of drug trafficking.

63. Moreover, based on my training and experience, I
know that narcotics traffickers maintain items such as those
listed in (a) through (i) in the preceding paragraph, in
locations where drug traffickers have ready access to them,
including their residences.

64. For the reasons set forth above, including the
factual events detailed in this affidavit, there is probable
cause to believe that items (a) through (i) listed in paragraph
62, all of which constitute evidence, fruits and
instrumentalities of violations of Title 21, United States Code,
Sections 841(a)(1) and 846, will be found in SUBJECT PREMISES ONE
and SUBJECT PREMISES TWO.

WHEREFORE, your deponent respectfully requests that a
warrant be issued authorizing Special Agents and Task Force
Officers of the DEA Task and other law enforcement officers to
enter SUBJECT PREMISES ONE and SUBJECT PREMISES TWO, within the
Eastern District of New York, and therein search for and seize
certain property, namely, (1) drugs, drug paraphernalia, scales,

drug residue, dilutants and materials related to distributing and/or manufacturing drugs; (2) firearms and ammunition; (3) books and records, including records stored on electronic media, showing cash transactions, prices and quantities of drugs bought and sold; (4) books and records, including records stored on electronic media, showing the names, addresses and telephone numbers of purchasers and suppliers of drugs, as well as the identities of confederates in drug trafficking; (5) pagers, electronic organizers, cellular telephones, computers, computer storage media, including, but not limited to, compact disks, DVDs, flash drives, thumb drives and external hard drives, and related bills and receipts; (6) motor vehicle records, telephone bills, property records showing ownership of assets purchased with drug proceeds; (7) currency used to purchase drugs, or reflecting proceeds of sales of drugs; (8) banking and financial records, including banking and financial records stored on electronic media, to include wire transfer receipts, bank deposit and withdrawal slips, and any other document evidencing a financial transaction that was conducted with proceeds; and (9) photographs, photographic negatives (developed and undeveloped), digital camera storage media, including, but not limited to, flash cards and memory sticks, and video tapes or disks, which show the identities of conspirators, contraband and evidence of drug trafficking.

WHEREFORE, your deponent further respectfully requests that a search warrant be issued authorizing Special Agents and Task Force Officers of the DEA Task and their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above-described matter, to search any pagers, electronic organizers, cellular telephones, computers, computer storage media, including, but not limited to, compact disks, DVDs, flash drives, thumb drives and external hard drives found within SUBJECT PREMISES ONE and SUBJECT PREMISES TWO for names, telephone numbers, addresses, e-mail addresses, text messages and other related information, including financial information, concerning the distribution of narcotics, all of which constitute evidence, fruits and instrumentalities of violations of Sections 841(a)(1) and 846 of Title 21 of the United States Code.

WHEREFORE, your deponent further respectfully requests that arrest warrants issue for the defendants DOMINICK CURATOLA, GERMAN CHAJCHIC and MICHAEL DECRESENZO so that they may be dealt with according to law.

Given the nature of this application, your deponent respectfully requests that this Affidavit and the Arrest Warrants

and Search Warrants be filed under seal until further order of

the Court.

William Steets
Special Agent
Drug Enforcement Administration

Sworn to before me this
10th day of November, 2010

HONORABLE A. KATHLEEN TOMLINSON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK